IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARTIN MCDERMOTT,                  :      CIVIL ACTION
                                   :      NO. 13-6980
          Plaintiff,               :
                                   :
     v.                            :
                                   :
NATIONSTAR MORTGAGE, LLC, et al.   :
                                   :
          Defendants.              :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                      November 13, 2015

          Plaintiff Martin McDermott brings this action

individually and on behalf of a putative class[1] under the Fair

Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692d-

1692g, against Defendant Nationstar Mortgage, LLC

("Nationstar"), a Delaware limited liability company engaged in

the business of mortgage lending. Before the Court is

Nationstar's Motion for Summary Judgment. For the reasons that

follow, the Court will deny the motion.

---

[1]      The Court has postponed considering class
certification until examining the merits of Plaintiff's claim by
way of Defendant's motion for summary judgment. See Fifth
Scheduling Order 1 n.1, ECF No. 42. In an Order dated January 7,
2015, the Court explained that "[i]f any of Plaintiff's claims
survive summary judgment, the parties will of course have an
opportunity to take additional discovery regarding class
certification." Id.

1

**I.    BACKGROUND**

A.    <u>Factual Background</u>[2]

In November 2009, McDermott financed the purchase of a home in part through a mortgage from Harleysville National Bank and Trust Company in the amount of $191,468.00. Mem. Law Support Def.'s Mot. Summ. J. 4, ECF No. 43-1 [hereinafter "Def.'s Mem."]. Shortly thereafter, McDermott's loan was transferred to Bank of America ("BOA"), and BOA began servicing the loan. <u>Id.</u>

In mid-2011, Defendant experienced difficulty making his monthly payments and entered into a forbearance agreement with BOA. <u>Id.</u> at 4. In December 2012, BOA advised McDermott that he was eligible for a loan modification program administered by the Federal Housing Authority ("FHA"). <u>Id.</u> at 4-5. In January 2013, McDermott and BOA entered into an FHA Trial Period Plan Agreement ("TPPA") to begin the loan modification process. <u>Id.</u> at 4.

Under the TPPA, McDermott agreed to pay $1,339.77 per month to BOA between February 2013 and April 2013. <u>Id.</u> If McDermott successfully complied with the new payment schedule,

---

[2]    For the purposes of this motion, McDermott does not dispute most of Nationstar's version of the facts, except to the extent that the referenced document speaks for itself or McDermott believes it calls for a legal conclusion. Pl.'s Resp. Statement Undisputed Facts, ECF No. 46-2. Any facts that McDermott otherwise disputes are addressed herein where pertinent.

BOA agreed to consider McDermott's loan "current under the terms of [] the Mortgage on the Property and [] the Note secured by the Mortgage." Id. at 5.

On May 9, 2013, after successfully completing the TTPA's obligations, BOA informed McDermott by letter that he was approved for loan modification. Id. at 5. The letter instructed McDermott as follows:

> You need to carefully review the enclosed Federal Housing Administration (FHA) Loan Modification Agreement and summary of your modified mortgage, sign where indicated and return to us by June 8, 2013 before we can modify your loan. The Loan Modification Agreement must be signed by all borrowers and any other owner(s) of the property in front of a notary and returned.

Def.'s Mem. Ex. E, at 1, ECF No. 43-6.

On May 13, 2013, before McDermott had signed or returned the Loan Modification Agreement, BOA informed McDermott by letter that it would transfer the servicing of his mortgage loan to Defendant Nationstar, effective June 4, 2013. Def.'s Mem. 6. In the letter, BOA stated that the transfer would not affect any terms or conditions of the mortgage loan, and that "[i]f [McDermott is] being considered for a loan modification or other foreclosure avoidance program, [the] new servicer Nationstar Mortgage LLC is aware of your current account status and will have all of your documents." Id. Ex. H, at 1.

Then, on May 30, 2013,[3] Nationstar wrote McDermott to
confirm that Nationstar would begin servicing his loan effective
June 4, 2013. Pl.'s Resp. 19; Def.'s Mem. 6. The letter stated
that its purpose was "to inform [McDermott] of certain
information relating to the pending transfer of [McDermott's]
loan." See Def.'s Mem. Ex. I. The letter made no reference to
the terms of the loan, the debt's amount, or the original
creditor.

On the same day that Nationstar officially acquired
servicing rights to McDermott's loan--June 4, 2013--McDermott
signed the Loan Modification Agreement ("the Agreement"), and
forwarded the document to BOA. Def.'s Mem. 5. BOA signed the
Agreement on June 6, 2013, and sent a fully executed copy of the
document to McDermott on June 7, 2013. Id. Ex. G.

The Agreement:

(1)   modified the principal amount of the
      mortgage    from    $180,748.59    to
      $192,318.65;

(2)   lowered  Plaintiff's  monthly  mortgage
      payment to $1335.73;

(3)   lowered the interest rate from 4.875%
      to a fixed rate of 3.875% for the life
      of the loan; and

(4)   extended the maturity date of the loan
      to 2043.

---

[3]     See infra note 9 (discussing the date of the May 2013
letter).

4

Def.'s Mem. 6. According to the Agreement, interest would begin to accrue at 3.875% on the modified principal balance as of June 1, 2013, and the new monthly payment was due the same day. Id. at 6.

On June 18, 2013, Nationstar notified McDermott by letter that BOA had transferred the servicing of the loan on June 4, 2013, and that "[n]othing else about your mortgage loan will change." Id. at 6 n.4; id. Ex. J, at 1. The letter additionally stated in a disclaimer that "[t]his is an attempt to collect a debt, and any information obtained will be used for that purpose." Id. Ex. J, at 1.

Also on June 18, 2013, Nationstar sent McDermott a notice, described as part of a "welcome packet," which listed the unpaid principal balance of McDermott's loan as $180,748.59 and the total amount due as $15,993.12. Id. at 7; id. Ex. K, at 1. These numbers reflected the original loan's terms, not the terms of the Loan Modification Agreement. The notice further informed McDermott that "[i]f you are in the process of applying for or providing information related to a workout (including modification) with BANK OF AMERICA, N.A., we anticipate that your information will soon be transferred to Nationstar Mortgage." Def.'s Mem. Ex. K, at 2.

On June 20, 2013, Nationstar sent McDermott a pre-foreclosure "Act 91 Notice," which stated "[t]his is an official

notice that the mortgage on your home is in default and the lender intends to foreclose." Def.'s Mem. 7; id. Ex. L, at 1. The notice asserted that if McDermott did not cure the default, Nationstar would accelerate the mortgage debt and foreclose upon the property. Def.'s Mem., Ex. L, at 6. It also stated in all capital letters that Nationstar "IS A DEBT COLLECTOR AND THAT THIS IS AN ATTEMPT TO COLLECT A DEBT." Id. at 8.

Nationstar received a copy of the Agreement between McDermott and BOA on approximately June 21, 2013. Def.'s Mem. 9; Pl.'s Resp. Statement Facts 5, ECF No. 46-2. Also on June 21, 2013, Nationstar sent McDermott a mortgage loan statement that again failed to reflect the Loan Modification Agreement's terms. Def.'s Mem. 12. Instead, the statement reflected the original mortgage's terms, listing the principal balance as $180,748.59, the interest rate at 4.875%, the monthly amount owed as $1431.58, and a past due payment of $15,791.34. Id.; see also id. Ex. M.

On July 11, 2013, Nationstar sent another letter to McDermott, stating that his payment was past due and that the property could be referred to foreclosure on July 25, 2013. Def.'s Mem. 8; id. Ex. N. Nationstar asserted that "[w]e have been unable to contact you or we have not yet received a complete initial package / borrower response package from you to consider you for a loan modification." Def.'s Mem. Ex. N, at 4.

6

The letter also contained the same pre-Agreement information
regarding McDermott's loan and once more stated that the letter
was a communication from a debt collector. Id. at 1, 5.

On July 18, 2013, McDermott received yet another
mortgage statement from Nationstar that listed the same pre-
Agreement information concerning the mortgage's principal
amount, the interest rate, and the amount due.[4] Def.'s Mem. 8;
id. Ex. O.

Then, in November 2013, McDermott received a copy of a
letter sent by Nationstar to the Pennsylvania Attorney General's
Office, which was dated October 22, 2013. Def.'s Mem. 9; id. Ex.
R. In response to a Consumer Complaint McDermott had filed, the
letter implicitly acknowledged that Nationstar had attempted to
collect inaccurate amounts and stated that, as of October 1,
2013, those issues "have been resolved." Letter to Att'y Gen.,
Oct. 22, 2013, Def.'s Mem. Ex. R., at 1. Nationstar stated that
it had "updated the account to reflect to the terms of the
agreement with Bank of America, N.A." Id. The letter concluded:

> We sincerely regret any inconvenience or
> delay Mr. McDermott may have experienced
> regarding this matter. Please know that
> Nationstar diligently worked to update the
> account. In order to complete the review of

---

[4]     Nationstar also sent McDermott mortgage statements on
both August 20, 2013, and September 18, 2013. Def.'s Mem. 8.
Each listed the pre-Agreement information concerning his
mortgage's principal amount, its interest rate, and the amount
due. Id.

> the previous servicer modification,
> Nationstar had to receive verification of
> the modified terms from Bank of America.

Id.

    B.   <u>Procedural History</u>

On December 2, 2013, McDermott commenced this action in federal court, asserting the following two counts on behalf of himself and a putative class:

> (1) Violation of the FDCPA, 15 U.S.C. §§ 1692d-1692g, and
>
> (2) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201-2(3)-(4), 201-3, 201-9.2(a).

Compl. ¶¶ 107-124, ECF No. 1.

McDermott avers that, by sending inaccurate notices and beginning the foreclosure process on his home, Nationstar acted with the purpose of deceiving unsuspecting consumers in order to obtain additional revenue and profit. Compl. ¶ 91. McDermott also claims that Nationstar "utilized various methods calculated to confuse, mislead, distract, coerce, and convert consumer funds for Defendant's sole benefit, by employing unethical business practices to secure pure financial gain and unjust financial enrichment." <u>Id.</u> ¶ 92. He further contends that members of a putative class "have sustained damages arising out [of] the same wrongful and uniform practices of Defendant." <u>Id.</u> ¶ 105.

On January 31, 2014, Nationstar filed a Motion to Dismiss the Complaint in its entirety. ECF No. 9. Following a hearing on March 11, 2014, this Court denied Nationstar's Motion to Dismiss, ECF No. 20, and entered a scheduling order, ECF No. 21.

Nationstar filed its Answer on April 1, 2014, ECF No. 26, and then eventually filed a motion for summary judgment on both of McDermott's claims. ECF No. 43. In response, McDermott voluntarily withdrew the UTPCPL claim. Pl.'s Resp. 25, ECF No. 46. Thereafter, Nationstar moved for leave to file a reply brief in further support of its motion, attaching the brief thereto. ECF No. 47. McDermott likewise filed a response to this second motion.[5] ECF No. 48. With only McDermott's FDCPA claim remaining, Nationstar's motion for summary judgment is now ripe for disposition.

## II.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle &

---

[5]      The Court will grant both parties' motions for leave to file reply briefs.

Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation; a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The court will "mak[e] all reasonable inferences in the nonmoving party's favor." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the movant bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation then shifts the burden to the nonmovant who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (internal quotation marks omitted). Summary judgment is only appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Jensen v. Pressler & Pressler, 791 F.3d 413, 424 (3d Cir. 2015) (alteration in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

### A.   The FDCPA

"The FDCPA provides a remedy for consumers who have been subjected to abusive, deceptive or unfair debt collection

practices by debt collectors." Piper v. Portnoff Law Assocs., Ltd., 396 F.3d 227, 232 (3d Cir. 2005). One of the FDCPA's basic tenets "is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt, deserve the right to be treated in a reasonable and civil manner." FTC v. Check Inv'rs, Inc., 502 F.3d 159, 165 (3d Cir. 2007). As such, the FDCPA prohibits a debt collector from using certain collection methods. Id. at 166 (citing Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1324 (7th Cir. 1997)). The prohibited methods include, among other things, "any conduct the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; "any false, deceptive, or misleading representation[s]," id. § 1692e; and any "unfair or unconscionable means" of collecting a debt, id. § 1692f. The FDCPA also requires debt collectors to include specific debt verification language in certain communications connected to their debt collection efforts. See id. § 1692g(a).

For the FDCPA's protections to apply, two threshold requirements must be satisfied. First, the person or entity engaging in the prohibited practice must be a "debt collector" within the meaning of the statute. Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403 (3d Cir. 2000) ("The FDCPA's provisions generally apply only to 'debt collectors.'"). Second, the

prohibited practice must have been "used in an attempt to collect on a 'debt.'" Id. at 400.

B.   Analysis

Nationstar contends that McDermott's FDCPA claim fails as a matter of law for two reasons: (1) the FDCPA does not apply because Nationstar is not a "debt collector," and (2) Nationstar did not violate 15 U.S.C. § 1692g, which requires specific debt verification language for the "initial communication with a consumer in connection with the collection of any debt." Def.'s Mem. 10. The Court will address each argument in turn.[6]

1.   Nationstar as a "Debt Collector"

Nationstar first contends that McDermott's claim fails as a matter of law because Nationstar is not a "debt collector" under the FDCPA. Id.

The FDCPA is intended to combat "the use of abusive, deceptive, and unfair debt collection practices by . . . debt collectors." 15 U.S.C. § 1692(a). As such, the FDCPA draws a distinction between "debt collectors," who are covered by the statute, and "creditors," who are not. 15 U.S.C. § 1692a(6).

---

[6]      Attached to this Memorandum as Exhibit "A" is a timeline with the dates most relevant to the two grounds for Nationstar's Motion. The events corresponding to those dates are provided with appropriate citations.

The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Id. A "creditor" is broadly defined as one who "offers or extends credit creating a debt or to whom a debt is owed," 15 U.S.C. § 1692a(4), and a creditor is generally considered to be restrained from abusive collection practices "by the desire to protect [its] good will when collecting past due accounts," FTC, 502 F.3d at 173 (quoting S. Rep. No. 95-382, at 2 (1977)).

The two FDCPA categories--debt collectors and creditors--are, for purposes of applying the statute to a particular debt, mutually exclusive. Schlosser v. Fairbanks Capital Corp., 323 F.3d 534, 536 (7th Cir. 2003). Yet, "for debts that do not originate with the one attempting collection, but are acquired from another, the collection activity related to that debt could logically fall into either category." Id.

In some instances, the acquiring entity acts as a mere creditor because it services the loan in the same way as the original entity that created the debt. FTC, 502 F.3d at 173. In others, the acquiring entity acts more like a debt collector if it has acquired the debt purely for the purpose of collection.

13

Id. The FDCPA distinguishes between these two possible scenarios by looking to the "status of the debt when it was acquired." Id. Accordingly, the term "debt collector" specifically excludes "any person collecting or attempting to collect on any debt owed" if the debt "was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F).

Here, to determine whether the loan was in default "at the time it was obtained" by Nationstar, the parties attempt to distinguish between the time when the <u>servicing rights</u> effectively transferred from BOA to Nationstar and the time when <u>the account</u> contractually transferred from BOA to Nationstar.

Nationstar argues that it is not a "debt collector" because, due to the Loan Modification Agreement, McDermott's loan was not in default when the servicing rights effectively transferred to Nationstar on June 4, 2013. Def.'s Mem. 11. Although Nationstar persistently treated McDermott's loan as in default, Nationstar now reasons that it is not a "debt collector" under the FDCPA because the default had in fact been cured by the Agreement prior to June 4, 2013, when Nationstar been servicing the loan. Id. at 12.

In response, McDermott avers that the determinative date is when Nationstar contractually acquired the account from BOA, not when servicing began. Pl.'s Resp. Mot. Leave File Reply Br. 2, ECF No. 48 [hereinafter "Pl.'s Resp. Reply Br."].

14

McDermott asserts that the loan was in default at the time Nationstar contractually acquired the loan from BOA sometime in May 2013,[7] and the Agreement did not take effect until June 2013. Therefore, McDermott contends that Nationstar was a "debt collector."

The FDCPA does not specifically demarcate when an entity has "obtained" a debt as the term is used in the definition of a "debt collector" in § 1692a(6). But courts have concluded that the FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not." Schlosser, 323 F.3d at 536.

Courts have, at times, used inconsistent language when determining if a debt was in default when obtained. Compare Pollice, 225 F.3d at 403 (explaining that "an assignee may be deemed a 'debt collector' if the obligation is already in default when it is assigned" (emphasis added)), with Fenello v. Bank of Am., N.A., 577 F. App'x 899, 902 (11th Cir. 2014)

---

[7]     To establish that Nationstar must have contractually acquired the account from BOA sometime in May 2013, McDermott relies on the following: (1) McDermott was notified by letter on May 13, 2013, that the servicing of his mortgage loan would transfer to Nationstar; (2) Nationstar sent McDermott the Welcome Letter at the end of May 2013; and (3) Nationstar's corporate representative stated in his deposition that "contractually I think the exchange of transfer happened in May." See Pl.'s Resp. Opp'n Summ. J. 14-15, ECF No. 46.

(focusing on "the time [defendant] became the servicer" (emphasis added)), and Haber v. Bank of Am., N.A., No. 14-0169, 2014 WL 2921659, at *7 (E.D. Pa. June 27, 2014) ("[A] mortgage servicer, whether servicing a debt belonging to itself or a different creditor, is not a 'debt collector' under the FDCPA unless the mortgage was already in default at the time the mortgage servicing company began servicing the loan."), and Dawson v. Dovenmuehle Mortg., Inc., No. 00-6171, 2002 WL 501499, at *5 (E.D. Pa. Apr. 3, 2002) (finding that an entity is a "debt collector" under the FDCPA "where the mortgage at issue was already in default at the time when servicing began" (emphasis added) (citing Perry v. Stewart Title Co., 756 F.2d 1197, 1208 (5th Cir. 1985)).

The Third Circuit has used the terms "assigned," Pollice, 225 F.3d at 403, and "acquired," FTC, 502 F.3d at 173, when addressing the situation where one debt collector has obtained the debt from another. Yet, district courts in this Circuit consistently cite to Pollice for the proposition that "[i]f an existing debt is assigned, the assignee of the obligation is not a 'debt collector' if the obligation is not in default at the time of the assignment; but if the obligation is in default when assigned, the assignee may be a 'debt collector.'" New-Howard v. JP Morgan Chase Bank N.A., No. 11-2855, 2013 WL 6096232, at *7 (E.D. Pa. Nov. 20, 2013); see also,

16

e.g., Kovacik v. PNC Bank, N.A., No. 15-0960, 2015 WL 5255265, at *3 (W.D. Pa. Sept. 9, 2015) (quoting the "at the time of assignment" language from Pollice).

Construing this language literally, the determinative date in this case would be when BOA assigned the contract to Nationstar in May 2013, even though Nationstar did not technically begin servicing the loan until June 4, 2013. As such, Nationstar would be a "debt collector" because the loan was still in default when Nationstar acquired it sometime in May 2013. Indeed, as Nationstar itself admits, McDermott's loan was not cured until later in June 2013. Def.'s Mem. 12. Thus, viewing the facts in the light most favorable to McDermott, the loan was in default when Nationstar obtained it, and summary judgment must be denied on this basis.

But the Court need not draw a semantic distinction. For the purposes of the present motion, even if the determinative date is when servicing began on June 4, 2013, as McDermott contends, the loan was still in default. Making all reasonable inferences in McDermott's favor, the default had not yet been cured by June 4, 2013, because (1) BOA had no obligation to modify the loan until McDermott returned and executed the Agreement, and (2) BOA would not have accepted the Agreement unless the loan was still in default when McDermott signed the Agreement.

17

First, although BOA preliminarily approved McDermott
for the modification on or about May 9, 2013, Def.'s Mem. Ex. E,
BOA had no obligation to modify the loan until McDermott signed
and returned the Agreement. When BOA originally notified
McDermott that he was eligible for a modification, the
notification letter included a paragraph entitled "How to Accept
this Offer," which stated as follows:

> You need to carefully review the enclosed
> Federal Housing Administration (FHA) Loan
> Modification Agreement and summary of your
> modified mortgage, sign where indicated and
> return to us by June 8, 2013 before we can
> modify your loan. The Loan Modification
> Agreement must be signed by all borrowers
> and any other owner(s) of the property in
> front of a notary and returned.

Def.'s Mem. Ex. E, at 1. The notification letter further
instructed McDermott that, "[i]f you want to accept the terms of
this proposed loan modification, each borrower must sign the
loan modification agreement and the other enclosed documents."
Id. at 3. The same notification letter also explained that "Bank
of America, N.A. will continue with normal servicing up to and
including referral to foreclosure during the time we are waiting
for required signed documents from you." Id. at 1. Finally, the
letter indicated that the modification was yet to be made,
stating that BOA "look[s] forward to taking the final steps to
provide you with more affordable mortgage payments." Id. Thus,

McDermott was in default and his loan was treated as such until the signed documents were returned to BOA.

McDermott did not sign the Agreement until June 4, 2013--the same day that BOA transferred the mortgage loan to Nationstar for servicing. See Def.'s Mem. Ex. I. When viewed in the light most favorable to McDermott at this stage of the proceedings, BOA could not have received the signed document any earlier than June 4, 2013, when McDermott signed it. Further, BOA itself did not sign the Agreement until June 6, 2013, and it was not until June 7, 2013 that BOA acknowledged receipt and completion of the Agreement.[8] Def.'s Mem. 5 ¶ 9; Pl.'s Resp. Ex. H, at 1, 12-13.

---

[8]     Even though the Loan Modification Agreement purported to be retroactively effective as of June 1, 2013, see Pl.'s Resp. Ex. H ¶ 3, when viewed in the light most favorable to McDermott, it had no retroactive effect on Nationstar's status as a debt collector. Generally speaking, a plaintiff "cannot use a duty created by a separate contract, to which it is neither a party nor a third-party beneficiary, to recover in contract against [a defendant]." See, e.g., Axis Specialty Ins. Co. v. Brickman Grp. Ltd., LLC, 458 F. App'x 220, 224 (3d Cir. 2012) (nonprecedential) (discussing Pennsylvania contract law). The same logic holds true in the unique situation presently before the Court where a defendant (i.e., Nationstar) that is neither a party nor a third-party beneficiary to a separate contract (i.e., the contract between BOA and McDermott) seeks to use the contract to defend against a plaintiff (i.e., McDermott). This is especially true where Nationstar did not acknowledge the contract until it was beneficial for it to do so. Nationstar treated the loan as in default from the moment it began seeking payment.

    Moreover, at least one court in this Circuit has suggested that a debt should be considered "in 'default' at the

Thus, drawing all reasonable inferences in McDermott's favor, the loan was still in default when Nationstar began servicing the loan on June 4, 2013, because BOA expressly stated that the modification would not be made until McDermott signed and returned the Agreement.

Second, the loan was still in default when Nationstar began servicing the loan based on the Agreement's express terms. In deciding whether a debt is "in default" at any given time under the FDCPA, courts have looked to the contractual provisions between the creditor and debtor. See Prince v. NCO Fin. Servs., Inc., 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004) (collecting district court cases).

Under the terms of the Agreement itself, BOA had no obligation to modify the loan unless the loan was still in default when McDermott signed the Agreement. BOA's obligation to modify the loan was expressly conditioned on the continued validity of McDermott's representations regarding the condition of his finances and his property. Pl.'s Resp. Ex. H, at ¶ 2.A-

---

time it was acquired if it could be said to have been in default under . . . a subjective view, because either the transferee or the transferor of the debt believed it was in default at the time of the acquisition." Haber v. Bank of Am., N.A., No. 14-0169, 2014 WL 2921659, at *15 n.16 (E.D. Pa. June 27, 2014) (citing Prince v. NCO Fin. Servs., Inc., 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004)). Indeed, it is disingenuous for Nationstar to have treated the debt as in default during all of its actions leading to the filing of this case and then rely on the Agreement that allegedly cured the default to advance its defense.

2.B. The Agreement would not take effect unless the representations "continue[d] to be true in all material respects." Id. at ¶ 3. Most relevant to the present issue, the Agreement required McDermott to certify that he was "in default under the Loan Documents" when he signed the Agreement. Id. at 5 ¶ 1.E. Consequently, BOA's signing and acceptance of the Agreement on June 6, 2013, and June 7, 2013, respectively, acknowledged that McDermott's loan was in default on the date of his signing: June 4, 2013.

Therefore, drawing all reasonable inferences in the light most favorable to McDermott, even if the Court were to adopt Nationstar's interpretation that June 4, 2013, is the determinative date, it cannot be said as a matter of law that the default had been cured. Accordingly, Nationstar's argument that it is not a "debt collector" under the FDCPA does not entitle Nationstar to summary judgment.

1.   15 U.S.C. § 1692g(a) and the Initial
         Communication

Nationstar next maintains that McDermott's claim under 15 U.S.C. § 1692g(a) cannot succeed as a matter of law because the May 2013[9] letter was not an attempt to collect a debt, and

---

[9]         There is some disagreement between the parties as to the exact date of the May 2013 letter. McDermott contends that the May 29, 2013, letter attached to Nationstar's motion was not the initial communication between Nationstar and McDermott. Pl.'s Resp. 19. Rather, McDermott refers to a letter dated May 30,

Nationstar's subsequent notice on June 18, 2013, complied with the statute. Def.'s Mem. 13-15.

In response, McDermott argues that the reverse side of the May 2013 letter contains information that renders it a "communication" related to "the collection of a debt" within the meaning of the FDCPA. Pl.'s Resp. 20-21. McDermott also states that when applying the FDCPA's "least sophisticated consumer" standard, McDermott would reasonably "interpret the correspondence of May 30, 2013, as an attempt to collect a debt." Id. at 22.

Under the FDCPA, a debt collector must provide specific information to a debtor in its initial communication

---

2013, which is included in to Plaintiff's response at Exhibit G, as the initial communication. Id.

Nationstar does not have a record of sending the May 30th letter, only the May 29th letter. Def.'s Mot. Leave File Reply Br. 6 n.5, ECF No. 47. However, Nationstar does not seem to dispute McDermott's asserted distinction. Instead, Nationstar simply argues that "[e]ven accepting [McDermott's] premise that the May 30th letter was the initial communication between Nationstar and [McDermott], the letter was also not 'in connection with the collection of a debt.'" Id. at 2.

McDermott concedes "there is no substantive difference between [the two letters'] front pages (other than the date)," Pl.'s Resp. 20, and Nationstar does not dispute the second page. Id. Accordingly, there is no genuine dispute of material fact as to the May 2013 letter, because the exact date does not have a bearing on the outcome of the litigation. See Anderson, 477 U.S. at 248. For the purposes of this motion, viewing the facts in the light most favorable to McDermott, the two-page letter dated May 30, 2013, will be the document to which the Court refers, described as the "May 2013" letter.

related to the collection of a debt or in a communication to be

sent within five days after the initial communication. 15 U.S.C.

§ 1692g(a). The notification must include the following

information:

>  (1)   the amount of the debt;
>
>  (2)   the name of the creditor to whom the
>        debt is owed;
>
>  (3)   a statement that unless the consumer,
>        within thirty days after receipt of the
>        notice, disputes the validity of the
>        debt, or any portion thereof, the debt
>        will be assumed to be valid by the debt
>        collector;
>
>  (4)   a statement that if the consumer
>        notifies the debt collector in writing
>        within the thirty-day period that the
>        debt, or any portion thereof, is
>        disputed, the debt collector will
>        obtain verification of the debt or a
>        copy of a judgment against the consumer
>        and a copy of such verification or
>        judgment will be mailed to the consumer
>        by the debt collector; and
>
>  (5)   a statement that, upon the consumer's
>        written request within the thirty-day
>        period, the debt collector will provide
>        the consumer with the name and address
>        of the original creditor, if different
>        from the current creditor.

Id.

The statute broadly defines "communication" as "the

conveying of information regarding a debt directly or indirectly

to any person through any medium." Id. § 1692a(2). But,

§ 1692g(a) "does not apply to every communication between a debt

collector and a debtor." <u>Grden v. Leikin Ingber & Winters PC</u>, 643 F.3d 169, 173 (6th Cir. 2011). Instead, to fall within § 1692g(a), "an animating purpose of the communication must be to induce payment by the debtor." <u>Simon v. FIA Card Servs.</u>, 732 F.3d 259, 266 (3d Cir. 2013) (quoting <u>Grden</u>, 642 F.3d at 173). So long as the "activity [is] undertaken for the general purpose of inducing payment . . . [the] communication need not contain an explicit demand for payment to constitute debt collection activity." <u>McLaughlin v. Phelan Hallinan & Schmieg, LLP</u>, 756 F.3d 240, 245 (3d Cir. 2014).

As the Third Circuit has explained, "communications that include discussions of the status of payment, offers of alternatives to default, and requests for financial information may be part of a dialogue to facilitate satisfaction of the debt and hence can constitute debt collection activity." <u>Id.</u> at 245-46. "[A] letter that is not itself a collection attempt, but that aims to make . . . such an attempt more likely to succeed, is one that has the requisite connection" to the collection of a debt. <u>Simon</u>, 732 F.3d at 266 (alterations in original) (quoting <u>Grden</u>, 643 F.3d at 173).

When a debt collector sends an initial communication in connection with debt collection activity, "more is required than the mere inclusion of the statutory debt validation notice in the debt collection letter--the required notice must also be

conveyed effectively to the debtor." <u>Wilson v. Quadramed Corp.</u>, 225 F.3d 350, 354 (3d Cir. 2000). In determining whether a particular validation notice meets the statutory requirements, it must "be interpreted from the perspective of the least sophisticated debtor." <u>Graziano v. Harrison</u>, 950 F.2d 107, 111 (3d Cir. 1991) (internal quotation marks omitted).

The "least sophisticated debtor" standard is "lower than the standard of a reasonable debtor," <u>Roseanau v. Unifund Corp.</u>, 539 F.3d 218, 221 (3d Cir. 2008), since "a communication that would not deceive or mislead a reasonable debtor might still deceive or mislead the least sophisticated debtor." <u>Brown v. Card Serv. Ctr.</u>, 464 F.3d 450, 454 (3d Cir. 2006) (internal quotation marks omitted). While the least sophisticated debtor standard "protects naïve consumers, 'it also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" <u>Id.</u> (quoting <u>Quadramed</u>, 225 F.3d at 354).

Here, the Court is not persuaded by McDermott's argument that the May 2013 letter is an initial communication in connection with the collection of a debt. The front page of the May 2013 letter expressly states that its purpose is to inform the recipient "of certain information relating to the pending transfer of your loan." Pl.'s Resp. Ex. G. Although the letter

25

implies that payments will be expected, it plainly reads as a
welcome letter from a new loan servicer--that is, one that would
be sent to any borrower, not just to borrowers in default. In
other words, the May 2013 letter looks to be a communication
that Nationstar sent in its capacity as a loan servicer, not in
its capacity as a debt collector, and thus its "animating
purpose" was not "to induce payment by the debtor." Simon, 732
F.3d at 266.

McDermott also contends that the paragraph on the
front page encouraging the debtor to visit Nationstar's website
is in connection with a debt collection because the website
contains "foreclosure alternative" options. Pl.'s Resp. 21. But
standing alone, a "website link provided in the communication
does not transform the [transfer] notice into an attempt to
induce payment." Olson v. Midland Funding, LLC, 578 F. App'x
248, 251 (4th Cir. 2014).

The letter's reverse side does not prove any more
helpful to McDermott's argument. McDermott specifically refers
to the boilerplate provisions that lay out the general
consequences of non-payment. Pl.'s Resp. Ex. G, at 2. McDermott
relies on McLaughlin v. Phelan Hallinan & Schmieg, LLP, 756 F.3d
240 (3d Cir. 2014), to argue that these provisions are related
to the collection of a debt. But McDermott does not explain how
McLaughlin can be analogized to the facts of this case.

26

In _McLaughlin_, the acquiring entity's letter stated that it was "a debt collector attempting to collect a debt" and that information obtained "'may be used for that purpose,' namely to collect a debt." _Id._ at 246. Moreover, the letter "inform[ed] the recipient how to obtain 'updated . . . payoff quotes,' meaning how to obtain current information about the amount that would have to be paid to satisfy the debt." _Id._ (omission in original). The Third Circuit explained that the letter was a "communication[] that include[d] discussions of the status of payment, offers of alternatives to default, and requests for financial information," which were "part of a dialogue to facilitate satisfaction of the debt and hence can constitute debt collection activity." _Id._ at 245-46. Therefore, the Third Circuit determined that the letter was a communication related to the collection of a debt, and the misrepresentation contained therein was a viable basis for FDCPA relief. _Id._ at 246.

Here, unlike in _McLaughlin_, Nationstar's May 2013 letter did not identify Nationstar as a debt collector attempting to collect a debt. It also did not state that the information obtained may be used to collect a debt or inform McDermott how to obtain updated payoff quotes. The letter did not discuss the status of payment, offer alternatives to default, or request financial information. As such, the general

27

consequences of non-payment set forth on the reverse side of
Nationstar's May 2013 letter do not indicate a specific debt
collection purpose as found in McLaughlin.[10]

McDermott's only allegation weighing in favor of
finding that the letter's purpose was to induce some form of
payment from McDermott is the nature of the parties'
relationship. Specifically, McDermott states that "the 'least
sophisticated consumer' would interpret the correspondence of
May 30, 2013, as an attempt to collect a debt[,] especially
where . . . this consumer has no other relationship with
Nationstar" and "Nationstar had no other reason to contact him."
Pl.'s Resp. 22.

However, the parties' relationship, standing alone, is
insufficient to establish that the May 2013 letter is a
communication in connection with the collection of a debt. See
Venechanos v. Green Tree Servicing, LLC, No. 14-2268, 2015 WL
4356326, at *7 (M.D. Pa. July 14, 2015) (discussing Olson, 578
F. App'x 248, and finding that "Plaintiff's debtor-debt
collector relationship, alone, is insufficient to establish that

---

[10]      For the same reasons, McDermott cannot rely on Grubb
v. Green Tree Servicing, LLC, No. 13-7421, 2014 WL 3696126
(D.N.J. July 24, 2014), in which a district court applied
McLaughlin. See id. at *6 (concluding that the welcome letter at
issue was a communication in connection with the collection of a
debt because "like in McLaughlin, the . . .[l]etter provides the
amount of debt, explains that the amount necessary to satisfy
the debt may increase due to interest and penalties, and
specifies how to obtain payoff quotes").

the Notice is a communication in connection with the collection of a debt"). Therefore, despite the parties' newly established relationship, the May 2013 letter still does not constitute a communication subject to § 1692g(a) because it was not made in connection with the collection of a debt.

Alternatively, McDermott characterizes the May 2013 letter as part of a "package of multiple documents," referring in a footnote to the combination of the May letter and two communications from Nationstar dated June 18, 2013.[11] Pl.'s Resp. 21-22, 25; id. at 22 n.70 (citing Exs. G, I, J). As such, McDermott does not exclusively rely on a single notice from Nationstar, but rather avers that the welcome package as a whole fails to satisfy the statutory requirements.[12] Pl.'s Resp. 21-22.

---

[11]      McDermott raised a version of this argument in his earlier reply to Nationstar's Motion to Dismiss. See Pl.'s Resp. Opp'n Mot. Dismiss, ECF No. 15. Therein, McDermott first argued that the May 30 letter was the initial communication for purposes of § 1692g(a), as he does here, and then made an alternative argument that even if the May 30 letter was not the initial communication, no subsequent communications --including those dated June 18th--satisfied § 1692g(a). Id. at 15-16. McDermott contended that although the later communications contained the requisite debt validation language, the information on which the debt validation was based did "not provide the correct principal balance of Plaintiff's mortgage, the interest rate, or the 'total amount due.'" Id.

[12]      Although the Third Circuit has stated "there can be only one 'initial communication' between a debt collector and a consumer," this statement was made to explain that a plaintiff's § 1692g(a) claim cannot survive the statute of limitations based on letters received after what was indisputably the initial communication in connection with the collection of a debt.

Nationstar states that even if McDermott were to rely on the later June 18, 2013 notice as the initial communication in connection with the collection of a debt, his § 1692g(a) claim would still fail. Def.'s Mem. 15. Nationstar argues that the June 18 notice contained the requisite debt validation language. Id. Specifically, Nationstar explains that the June 18 notice "prominently stated the servicer's name and the balance of Plaintiff's Loan" as well as included "an explicit 'Validation of Debt Notice' section which satisfied the requirements of [the statute]." Id.; see also Pl.'s Resp. Ex. J. Nationstar thus concludes that even if the June 18 notice, instead of the May 2013 welcome letter, was construed as the initial communication in connection with the collection of a debt, McDermott's § 1692g(a) claim must still fail as a matter of law.

Section 1692g(a) requires, among other things, that the collector provide the consumer with written notice containing the amount of the debt. 15 U.S.C. § 1692g(a)(1). It is clear in this Circuit that the § 1692g(a) validation notice

---

Peterson v. Portfolio Recovery Assocs., LLC, 430 F. App'x 112, 114 (3d Cir. 2011). If the May 30 letter does not constitute the initial communication because it was not made in connection with the collection of McDermott's debt, as analyzed above, it does not foreclose the characterization of a later communication as "the initial communication in connection with the collection of [a] debt." 15 U.S.C. § 1692g(a)(emphasis added).

must "be conveyed effectively to the debtor." Quadramed, 225
F.3d at 354; see also Harrison, 950 F.2d at 111 (entity must
"explicate a debtor's rights . . . effectively").

Here, even if the June 18 communication provided the
requisite § 1692g(a) material on its face, as Nationstar
contends, the notice stated the loan's principal balance and the
amount due based on the original loan with BOA, prior to the
execution of the Loan Modification Agreement. Def.'s Mem. 7
¶ 19; see id. at Ex. K. It was not until October 1, 2013, that
Nationstar finally updated McDermott's account to reflect the
modification, see Def.'s Mem. Ex. R, at 1, after it had already
sent McDermott multiple notices based on the pre-Agreement
information and threatened foreclosure.

The parties do not directly address the importance of
accurate information in a § 1692g(a) notice. Yet it would be
wholly irrational for Congress to have required debt collectors
to provide consumers with specific debt validation information
when collecting on a debt, but to have been completely
indifferent as to whether the specific information is accurate.

The entire purpose of the § 1692g(a) validation notice
is "to inform a debtor of his rights and obligations to his
creditor." Oppong v. First Union Mortg. Corp., 566 F. Supp. 2d
395, 400 (E.D. Pa. 2008), aff'd in part, vacated in part on
other grounds, 215 F. App'x 114 (3d Cir. 2007). It can hardly be

said that a substantially incorrect[13] statement of the debt

amount--the core target of the debt collection efforts--

"effectively" conveys a debtor's rights and obligations.

Quadramed, 225 F.3d at 354. A "rational trier of fact," Jensen,

791 F.3d at 424, could certainly determine that Nationstar's

notice containing the pre-Agreement debt information would

deceive or mislead the "least sophisticated debtor." Quadramed,

225 F.3d at 354.

    In sum, if the May 30 letter is construed as the

initial communication in connection with the collection of a

debt, it cannot be said that Nationstar prevails as a matter of

law under § 1692g(a), because the undisputed facts show that the

---

[13]    The Court need not presently decide the degree to
which the information must be incorrect. District courts vary in
determining whether "the amount of the debt" is sufficiently
accurate to satisfy § 1692g(a)'s notice requirements. See, e.g.,
Gesten v. Phelan Hallinan, PLC, 57 F. Supp. 3d 1381, 1388 (S.D.
Fla. 2014) (collecting cases). But here, Nationstar's letters
plainly fall below the standard for compliance. This is not a
case where the letter simply provided the amount of debt as of
one day prior to the date of the letter. See, e.g., Grubb, 2014
WL 3696126, at *8. Instead, in this case, the statements are
clearly incorrect. In the June 18, 2013 letter, the "Principal
Balance" was stated as $180,748.59, and the "TOTAL AMOUNT DUE"
was stated as $15,993.12. Def.'s Mem. 7; id. Ex. K. These pre-
Agreement terms were further reflected in the subsequent
statement, which stated: (a) the principal balance as
$180,748.59; (b) the interest rate as 4.875%; and (c) the
monthly payment as $1,431.58. Id. at 7; id. Ex. M. These terms
are in stark contrast to the terms in the Loan Modification
Agreement, which stated: (a) the principal balance as
$192,318.65; (b) the interest rate as 3.875%; and (c) the
monthly payment as $1,335.73. Id. at 6; id. Ex. G, at 4.

letter does not contain the requisite information.
Alternatively, if the June 18 letter is construed as the initial
communication in connection with the collection of a debt, it
cannot be said that Nationstar prevails as a matter of law,
because the letter substantially misstates the debt information.
Therefore, the Court denies Nationstar's motion for summary
judgment as to the § 1692g(a) claim.

**IV.  CONCLUSION**

For the foregoing reasons, the Court denies
Defendant's motion for summary judgment in its entirety. An
appropriate order follows.

EXHIBIT "A"

| May 9, 2013 | • BOA informs McDermott he has been approved for a loan modification. Def.'s Mem. Ex. E. |
| --- | --- |
| May 2013 (unspecified date) | • Nationstar contractually acquires McDermott's loan from BOA. Pl.'s Resp. 14-16. |
| May 30, 2013 | • Nationstar sends Welcome Letter to McDermott. Pl.'s Resp. Ex. G. |
| June 1, 2013 | • Purported retroactively effective date of Loan Modification Agreement. Pl.'s Resp. Ex. H. |
| June 4, 2013 | • McDermott executes Loan Modification Agreement. Pl.'s Resp., Ex. H.<br>• Nationstar effectively acquires servicing rights to McDermott's loan from BOA. Pl.'s Resp. Exs. G, R. |
| June 6, 2013 | • BOA executes Loan Modification Agreement. Pl.'s Resp., Ex. H. |
| June 7, 2013 | • BOA returns executed copy of Loan Modification Agreement to McDermott and states that modification is finalized. Pl.'s Resp. Ex. H. |
| June 18, 2013 | • Nationstar sends notice stating principal balance and total amount due based on pre-Agreement terms. Pl.'s Resp. Ex. J. |